# United States Court of Appeals
## For the First Circuit

No. 00-1105
No. 00-1330

UNITED STATES OF AMERICA,

Appellant,

v.

F. WILLIAM SAWYER,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Boudin, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lipez, Circuit Judge.

Ben T. Clements, Assistant United States Attorney, with whom David S. Mackey, Acting United States Attorney, was on brief, for appellant.
Thomas R. Kiley, with whom Gregory S. Gilman and Cosgrove, Eisenberg & Kiley, P.C. were on brief, for appellee.

January 31, 2001

**LIPEZ, Circuit Judge**.  The United States appeals from a judgment of the district court granting F. William Sawyer a writ of error coram nobis, vacating his guilty plea to a one-count information charging him with honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, and ordering that his record be expunged.  The district court based its decision on a recent opinion of the Supreme Court, United States v. Sun-Diamond Growers of California, 526 U.S. 398 (1999), construing the federal gratuities law, 18 U.S.C. § 201, to require that the prosecution prove a link between the act of a public official and the gratuity received by the official for or because of that act.  Sawyer contended, and the district court agreed, that the information to which he pled guilty required proof of a violation of the similarly worded Massachusetts gratuity law, chapter 268A, section three.  Concluding that this state gratuity law should be interpreted in light of Sun-Diamond, the district court found that the government had to prove that Sawyer gave gratuities to public officials for specific official acts.  Noting that the government had not even alleged a link between the gratuities and identifiable, specific official acts, the court ruled that Sawyer was prosecuted "for an act that the law does not make criminal," and that his conviction "was a

legal error of fundamental proportion," to be redressed by the issuance of a writ of coram nobis.

We conclude that the information to which Sawyer pled guilty did not require proof that he violated the Massachusetts gratuity statute. Moreover, there was sufficient evidence to prove Sawyer's guilt of honest services mail fraud apart from proof that he violated any state law. There was no fundamental error in his plea of guilty. The writ should not have issued. We reverse the judgment of the district court.

## I.

This appeal comes to us following a long history. We recount only those facts that are relevant to our analysis here, and refer to our decisions in United States v. Sawyer, 85 F.3d 713, 720-22 (1st Cir. 1996), and United States v. Woodward, 149 F.3d 46, 51-54 (1st Cir. 1998), for a more detailed recitation of the circumstances giving rise to Sawyer's prosecution.

Sawyer was employed by the John Hancock Mutual Life Insurance Company ("Hancock") as a lobbyist in its Governmental Relations Department. As part of his responsibilities, he tracked the progress of pending legislation in the Massachusetts legislature. He also lobbied legislators, particularly members of the Legislature's Joint Insurance Committee, to adopt positions favorable to Hancock's interests in the insurance industry. In order to cultivate goodwill with these

-3-

individuals, Sawyer paid for numerous meals, rounds of golf, and other entertainment on their behalf. Sawyer treated these activities as business expenses and submitted monthly expense vouchers to Hancock's accounting department for reimbursement.

Sawyer and a group of legislators travelled to Puerto Rico in December 1992 for a legislative conference, and Hancock reimbursed Sawyer approximately $4,000 for entertainment expenses incurred during that trip. In April, 1993, the Boston Globe began an investigation of Sawyer's expenditures in Puerto Rico, and the Globe's inquiries to Hancock prompted the company to conduct an internal review of Sawyer's legislative expenditures. Shortly thereafter, the United States Attorney's Office for the District of Massachusetts commenced its investigation of Sawyer's allegedly illegal expenditures.[1]

A grand jury returned an indictment against Sawyer on July 7, 1994, charging him with violations of federal gratuity and bribery statutes, including 18 U.S.C. §§ 1341 and 1346, as well as violations of the Travel Act.[2] Following a jury trial

_____

[1] In March 1994, Hancock entered into a civil settlement with the United States Attorney's Office, pursuant to which it paid a fine of approximately $1,000,000 and agreed to cooperate fully with the investigation.

[2] The Travel Act proscribes travel in interstate commerce "with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying

lasting nine days, the jury convicted him on 33 counts,[3] and the trial court sentenced him to one year and one day in prison. Sawyer then appealed his convictions and sentence to this Court. In an opinion issued on May 30, 1996, we vacated Sawyer's convictions because we concluded that the jury instructions might have allowed the jury to convict Sawyer on an improper basis.

Following remand, the U.S. Attorney's Office decided to prosecute Sawyer again. On November 27, 1996, pursuant to a plea agreement, Sawyer pled guilty before Judge Harrington to a one-count information charging him with honest services mail fraud under 18 U.S.C. §§ 1341 and 1346. As part of the plea agreement, the prosecution dismissed the original indictment of July, 1994. The court was clearly troubled by the government's prosecution of Sawyer's case at the time his plea was entered. At the plea hearing, the court commented:

---

on, of any unlawful activity." 18 U.S.C. § 1952(a). The statute defines "unlawful activity" as, inter alia, "bribery . . . in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(b). The government did not renew its prosecution of Sawyer under the Travel Act after we reversed his convictions following his first appeal to this Court.

[3] More specifically, the jury convicted Sawyer of 15 counts of mail fraud, 9 counts of wire fraud, 8 counts of interstate travel to commit bribery, and 1 count of conspiracy. The jury acquitted him of two additional counts of mail fraud.

This case demonstrates the threat to the liberty and reputation of individuals when the state's gratuity and gift laws administered by the Massachusetts State Ethics Commission and typically enforced by the imposition of civil penalties can be selectively transformed into a serious federal felony under the broad language and elastic interpretation of the federal criminal fraud statute.

This case illustrates an innovative prosecutorial process called the "federalization" of state laws. As the Court of Appeals stated, "prosecutions on facts like these have not generally been brought." The threat is exacerbated here because this "federalized" prosecution is applied for the first and only time against a state lobbyist who is not himself a public official.

This case raises a grave concern in my mind as to whether a constituent element of due process, namely, adequate notice of the offense for which one is charged, and whether the fundamental principle of the criminal law that criminal statutes must be strictly, not expansively, construed have been complied with. A defendant must be plainly apprised in advance that his conduct is criminal so that he can possess the requisite "criminal intent" necessary to be branded a felon.

I do not condone defendant's conduct, but assert that it would have been more just for any ethical irregularity on his part specifically prescribed under state statutes in the payment of golfing fees and dinner expenses to have been pursued by the Massachusetts State Ethics Commission or in the Massachusetts courts and not be selectively used as a basis for a federal prosecution for the serious felony of criminal fraud.

The fact that even the government acknowledges that criminal fraud is not intended here is established in my mind by the fact that after this wrong and tortuous

-6-

> ordeal they are able to enter into a plea
> agreement where a man is allowed to plea[d]
> to one count of a criminal information that
> charges that he mailed one mailing in
> furtherance of the fraud in the amount of
> about a $183 [sic].
>           My question is, does this result
> justify the long ordeal that this defendant
> has undergone?  I don't think so.

Despite this uneasiness with the government's decision to prosecute Sawyer, Judge Harrington accepted his plea, sentenced him to one year of probation, and ordered that he pay a fine and a special assessment.

In July, 1999, nearly two years after Sawyer completed his probation, and paid the monies assessed against him, he petitioned the district court for a writ of error coram nobis on the basis of the Supreme Court's Sun-Diamond decision.  This petition was brought before Judge Harrington.  As noted, Judge Harrington granted the writ, vacated his plea, and ordered the expungement of his record, thereby prompting this appeal by the government.  We review de novo the court's legal conclusions in granting the writ, see United States v. Camacho-Bordes, 94 F.3d 1168, 1173 (8th Cir. 1996); we review its findings of fact for clear error, see United States v. Blanton, 94 F.3d 227, 230 (6th Cir. 1996).

**II.**

In reaching our decision in this case, we do not have to rule on the government's argument that coram nobis relief is unavailable to correct fundamental errors of law. Nevertheless, we provide some background on the writ to provide the context for our fundamental error of law analysis.

Pursuant to the All Writs Act, federal courts have the authority to grant writs that were traditionally available at common law. See 28 U.S.C. § 1651. The writ of error coram nobis[4] originated in the sixteenth century as a means to allow a trial court to correct its own mistakes of fact. See LaFave, Israel & King, Criminal Procedure, § 28.1(c) (2d ed. 1991). Before coram nobis emerged, trial courts did not have the authority to correct their own errors, and appellate courts could consider only alleged mistakes of law. See id. Accordingly, coram nobis originally was developed to fill this gap by correcting errors of fact that the trial court could not have known but which, if known at the time of trial, would have prevented entry of judgment. See id. In its more modern usage,

---

[4] In Latin, "coram nobis" means "before us." Originally, the petition was submitted in the court of the King's Bench, or "before us" in the sense of being before the King. In contrast, the writ of coram vobis, an analogous procedure, was brought before judges of the court of Common Pleas, or "before you." The distinction between these terms is "virtually meaningless in the American context." M. Diane Duszak, Note, Post-McNally Review of Invalid Convictions Through the Writ of Coram Nobis, 58 Fordham L. Rev. 979, 981 n.18 (1990).

the writ was available in criminal cases "whether the error was in fact or law," but applied "only to that very small number of legal questions which concerned the regularity of the proceeding itself." United States v. Mayer, 235 U.S. 55, 68 (1914) (quotations omitted).

For example, the writ was available where the defendant was an escaped slave, had been insane at the time of trial, or had entered a guilty plea out of fear of mob violence. See LaFave, Israel & King, § 28.1(c). The Supreme Court's most recent pronouncement on coram nobis noted that the writ was traditionally available in situations "such as the defendant's being under age or having died before the verdict." United States v. Carlisle, 517 U.S. 416, 429 (1996). Because such errors were considered errors of fact, and not errors of the judges, reversing the judgment and expunging the conviction was not considered to be a reversal of their own judgment. See Mayer, 235 U.S. at 68. Unlike a writ of habeas corpus, a writ of coram nobis is issued once the petitioner is no longer in custody. Its legal effect is to vacate the underlying conviction. As its Latin name suggests, a petition for a writ of error coram nobis is brought to the court that convicted and sentenced the defendant.

Although the Federal Rules of Civil Procedure expressly abolished the use of coram nobis in civil cases in the United

States, see Fed. R. Crim. P. 60(b), the issue of the writ's availability to correct fundamental errors in criminal cases remained uncertain for many years. In United States v. Morgan, the Supreme Court resolved this question, holding that coram nobis was still available in federal court for criminal cases. See 346 U.S. 502, 512 (1954). However, the Court noted that coram nobis, while still available, is an "extraodinary remedy" allowed "only under circumstances compelling such action to achieve justice." Id. at 511.

More than forty years after Morgan, the Supreme Court questioned the continuing vitality of coram nobis as a remedy for fundamental legal error as well as errors of fact. See Carlisle, 517 U.S. at 428-29. Although the question was not squarely presented on appeal in Carlisle - because the trial court had not been asked to issue the writ, and did not purport to do so - the Court noted, "the writ would not have lain here, since it was traditionally available only to bring before the court factual errors 'material to the validity and regularity of the legal proceeding itself,' such as the defendant's being under age or having died before the verdict." Id. at 429 (emphasis added). The Court stated further: "it is difficult to conceive of a situation in a federal criminal case today where [a writ of coram nobis] would be necessary or appropriate." Id.

(quoting <u>United States</u> v. <u>Smith</u>, 331 U.S. 469, 475 n.4 (1947)).

Notwithstanding these comments in <u>Carlisle</u>, some federal courts have continued to assume that writs of coram nobis may correct errors of law as well as errors of fact. <u>See, e.g.</u>, <u>United States</u> v. <u>Tucor Int'l, Inc.</u>, 189 F.3d 834, 836 n.1 (9th Cir. 1999); <u>Martinez</u> v. <u>United States</u>, 90 F. Supp. 2d 1072, 1075 (D. Haw. 2000) (stating that coram nobis allows a court to vacate a judgment for "egregious legal errors") (quotation omitted); <u>United States</u> v. <u>Rankin</u>, 1 F. Supp. 2d 445, 453 (E.D. Pa. 1998) (noting that coram nobis has been used to correct errors of law in criminal cases). <u>But</u> <u>see</u> <u>Tavares</u> v. <u>Massachusetts</u>, 59 F. Supp. 2d 152, 154 (D. Mass. 1999) ("The writ is not available in federal courts for errors of law"). Sawyer contends that the writ is proper to redress legal error, while the government contends it may be granted to vacate a conviction based on mistakes of fact only. The district court agreed with Sawyer on this point, ruling that the writ is available to correct legal error.

In deciding whether to grant the writ, courts have used a three-part test: a petitioner must 1) explain her failure to seek relief from judgment earlier, 2) demonstrate continuing collateral consequences from the conviction, and 3) prove that the error is fundamental to the validity of the judgment. <u>See</u>

-11-

United States v. <u>Hager</u>, 993 F.2d 4, 5 (1st Cir. 1993); <u>see</u> <u>also</u>

United States v. <u>Mandanici</u>, 205 F.3d 519, 524 (2d Cir. 2000);

United States v. <u>Barrett</u>, 178 F.3d 34, 56 n.20 (1st Cir. 1999).

We assume, without deciding, that a writ of coram nobis is

available to vacate a criminal conviction premised upon a

fundamental error of law.  We also express no opinion on whether

Sawyer could meet the first and second prongs of the standard

for issuance.    However, we conclude that Sawyer was not

entitled to the writ because there was no fundamental legal

error in his conviction.

### III.

**A.      The Federal Gratuities and Honest Services Mail Fraud
         Statutes**

Sawyer contends that the Supreme Court's decision in

<u>Sun-Diamond</u> provides grounds for vacating his conviction.  In

that opinion, the Court interpreted the federal gratuities

statute, 18 U.S.C. § 201,[5] to mean that the prosecution must

prove a link between an object of value given to a public

official and a specific official act for or because of which it

was given.  <u>See</u> <u>Sun-Diamond</u>, 526 U.S. at 406.  Sawyer argued in

---

[5] 18 U.S.C. § 201(c) provides, in relevant part, that anyone
who "otherwise than as provided by law for the proper discharge
of official duty . . . directly or indirectly gives, offers, or
promises anything of value to any public official . . . for or
because of any official act performed or to be performed by such
public official . . . shall be fined under this title or
imprisoned for not more than two years, or both."

his petition for coram nobis that the analogous gratuity statute in Massachusetts, chapter 268A, section three ("section three"), should be construed similarly to require proof of a specific official act for which the gratuity was given. Indeed, since Sawyer filed his petition - and since the district court decided to grant the writ - the Supreme Judicial Court of Massachusetts has ruled, relying partly on Sun-Diamond, that to establish a violation of section three, "there must be proof of linkage to a particular official act." Scaccia v. State Ethics Comm'n, 431 Mass. 351, 356 (2000). Sawyer claims that the information to which he pled guilty was based on his violation of section three, requiring the government to have demonstrated a link between his allegedly illegal gratuities and specific, identifiable official acts of Massachusetts legislators. Because the prosecution did not attempt to offer such proof, he believes that Sun-Diamond renders his conviction unjust. We disagree.

Sawyer pled guilty to one count of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.[6] We have

_____

[6] 18 U.S.C. § 1341 provides, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office . . . any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined under this title or imprisoned not more than five years, or both." Section 1346 defines "scheme or artifice to defraud" as "a scheme or artifice

recognized previously that "Congress enacted this statute [§ 1341] in 1872, as 'a general proscription against using the mails to initiate correspondence in furtherance of any 'scheme or artifice to defraud.'''" United States v. Grandmaison, 77 F.3d 555, 565 (1st Cir. 1996) (quoting McNally v. United States, 483 U.S. 350, 356 (1987)). The legislative history of § 1341 suggests that Congress intended to shield people from "schemes to deprive them of their money or property" in passing the statute. McNally, 483 U.S. at 356. More recently, the Supreme Court has interpreted the meaning of "fraud" in § 1341 to "incorporate the well-settled meaning of the common-law" in the absence of explicit evidence of Congressional intent to the contrary. Neder v. United States, 527 U.S. 1, 23 (1999).

Before 1987, most courts interpreted § 1341 broadly to reach schemes to defraud people of intangible property interests - such as the honest services of their public officials - as well as tangible property rights. See Grandmaison, 77 F.3d at 565. The Supreme Court held in McNally, however, that § 1341 did not reach schemes to defraud citizens of their intangible right to the honest government services of their public officers. See McNally, 483 U.S. at 355. Congress promptly responded to this decision by enacting § 1346, which proscribes

to deprive another of the intangible right of honest services."

-14-

schemes "to deprive another of the <u>intangible</u> right of honest services." 18 U.S.C. § 1346 (emphasis added). We have recognized that § 1346 was intended to overrule <u>McNally</u> by placing honest services mail fraud within the ambit of § 1341. <u>See, e.g.</u>, <u>Sawyer</u>, 85 F.3d at 723; <u>Grandmaison</u>, 77 F.3d at 565-66.

Underlying the applicability of §§ 1341 and 1346 to government officials is the notion that "a public official acts as 'trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty' to them." <u>United States</u> v. <u>Silvano</u>, 812 F.2d 754, 759 (1st Cir. 1987) (quoting <u>United States</u> v. <u>Mandel</u>, 591 F.2d 1347, 1363 (4th Cir. 1979)). Theft of honest services occurs when a public official strays from this duty:

> When a government officer decides how to proceed in an official endeavor - as when a legislator decides how to vote on an issue - his constituents have a right to have their best interests form the basis of that decision. If the official instead secretly makes his decision based on his own personal interests - as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest - the official has defrauded the public of his honest services.

<u>United States</u> v. <u>Lopez-Lukis</u>, 102 F.3d 1164, 1169 (11th Cir. 1997).

**B.        Elements of the Honest Services Mail Fraud Statutes**

-15-

The government must prove two elements to establish a violation of § 1341.  The simpler of the two elements requires the defendant to have used the mails in furtherance of the scheme to defraud.  See Woodward, 149 F.3d at 54; Sawyer, 85 F.3d at 723.  The mailings themselves need not be essential to the defendant's scheme; rather, the mailings must have been made to execute the scheme.  See United States v. Schmuck, 489 U.S. 705, 710-11 (1989); see also Silvano, 812 F.2d at 760 ("A mailing need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions.").  There is no requirement that the defendant herself was responsible for the mailing that establishes the jurisdictional hook.  See United States v. Morrow, 39 F.3d 1228, 1237 (1st Cir. 1994).

The second element of mail fraud requires the prosecution to establish that the defendant participated in a scheme or artifice to defraud with the specific intent[7] to defraud.  See Woodward, 149 F.3d at 54; Sawyer, 85 F.3d at 723.  "Scheme or artifice to defraud" is defined by § 1346 as "a scheme or artifice to deprive another of the intangible right of

---

[7] We recognize that "specific intent" is a legal term of art with a particularized meaning.  In the context of § 1341, as we discuss infra, this term simply means that a public official must have acted with the intent to deprive the public of that official's honest services.  See Sawyer, 85 F.3d at 729; see also Woodward, 149 F.3d at 55.

honest services."  18 U.S.C. § 1346.  In Woodward, drawing upon

Sawyer, we articulated the following formulation of the elements

of § 1346: "In Sawyer, we noted two of the ways that a public

official can steal his honest services from his public employer:

(1) the official can be influenced or otherwise improperly

affected in the performance of his duties . . . ; or (2) the

official can fail to disclose a conflict of interest, resulting

in personal gain."  Woodward, 149 F.3d at 57 (citations

omitted).[8]  See also Sawyer, 85 F.3d at 724 ("The cases in which

a deprivation of an official's honest services is found

typically involve either bribery of the official[9] or her failure

---

[8] We distinguish between a gift given with the intent to
influence official action generally, required under § 1341, and
a gift given for or because of an official act that has been
performed or will be performed by a government officer, now
required under § 201.  Indeed, Sawyer has not alleged that Sun-
Diamond, interpreting 18 U.S.C. § 201, should apply by analogy
to honest services mail fraud under § 1341 to require that the
government prove a link between the gratuity and an official act
for or because of which it was given.  While Sun-Diamond does
not specifically mention § 1341, to read that opinion as
affecting the well-settled interpretation of § 1341 would be
inconsistent with its rationale.  The Supreme Court partly based
its decision in Sun-Diamond on a desire to read § 201, the
gratuity statute, in a way that made sense given the "intricate
web of regulations, both administrative and criminal, governing
the acceptance of gifts" by public officials.  Sun-Diamond, 526
U.S. at 409.  The Court noted specifically, "we ought not expand
this one piece of the regulatory puzzle so dramatically as to
make many other pieces misfits." 526 U.S. at 412.

[9] Although Sawyer initially describes this first element of
§ 1346 as involving proof of bribery, we recognized in Woodward
that "[t]he Sawyer case expanded category (1) from quid pro quo
bribery, to include a more generalized pattern of gratuities to

-17-

to disclose a conflict of interest, resulting in personal gain."). We have recognized that this duty of disclosure arises not exclusively by statute, but also from the general fiduciary duty a public official owes to the public. In Woodward, we noted, "separate and apart from the state statute, '[t]he obligation to disclose material information inheres in the legislator's general fiduciary duty to the public.'" 149 F.3d at 62 (quoting Sawyer, 85 F.3d at 733 n.17). See also Silvano, 812 F.2d at 759 (stating, "the affirmative duty to disclose material information arises out of a government official's fiduciary relationship to his or her employer").

Because the practice of using hospitality to cultivate business relationships is "longstanding and pervasive," Sawyer, 85 F.3d at 741, it may become difficult to distinguish between lawful entertaining and acts that violate the honest services mail fraud statute. Intent is thus a crucial aspect of proof in any such prosecution, and "[d]irect proof of fraudulent intent is often difficult to find." United States v. Rosen, 130 F.3d 5, 9 (1st Cir. 1997). Having closely examined this issue of intent in Sawyer, we said in that opinion that the government must prove that the accused acted with two kinds of intent: that she intended to deprive the public of her honest services, and

---

coax 'ongoing favorable official action.'" Woodward, 149 F.3d at 55 (quoting Sawyer, 85 F.3d at 730).

that she intended to deceive the public.  See Sawyer, 85 F.3d at 729; see also Woodward, 149 F.3d at 55.  While proof of the two kinds of intent might seem similar, these inquiries are distinct.  See Sawyer, 85 F.3d at 729 n.12.  "[W]hile it may be difficult to conceive of a scheme to deprive someone of the right to honest services without intending to deceive that person, the intent to deceive must nonetheless be established."  Id. at 732 n.16.[10]

For the government to establish the requisite intent to deprive the public of a legislator's honest services, the first of the two intent requirements for honest services mail fraud, the defendant must have intended to influence that legislator in her official action.  See Sawyer, 85 F.3d at 729.  The government may demonstrate this intent in many ways:

> For example, a bribery-like, corrupt intent
> to influence official action necessarily is

---

[10] We acknowledge that there seems to be some redundancy in the formulation of elements of honest services mail fraud.  For example, in proving that an official intended to deceive the public, "[that] official's intentional violation of the duty to disclose provides the requisite 'deceit.'"  Sawyer, 85 F.3d at 732.  Thus, when the government seeks to prove a defendant's intent to deprive the public of an official's honest services by showing that she failed to disclose a conflict of interest, the evidence regarding that failure to disclose automatically satisfies the "intent to deceive" prong of § 1341.  We recognized this point in Woodward.  Having described the evidence that Woodward failed to disclose gifts from lobbyists, we then stated: "[t]his same evidence also supports the finding that Woodward had the intent to deceive necessary for a mail and wire fraud conviction."  Woodward, 149 F.3d at 63.

an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful gratuity with the intent to effect a specific quid pro quo. Rather, as the government contends here, a person with continuing and long-term interests before an official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services.

Id. at 730. We reversed Sawyer's convictions for mail and wire fraud because we concluded that the jury instructions at his trial permitted the jury to convict him without finding that he intended to influence official action.[11]

_____

[11] More specifically, we concluded in Sawyer that the jury instructions allowed the jury to find Sawyer guilty of honest services mail fraud upon proof that he violated either the Massachusetts gratuity statute, Mass. Gen. Laws ch. 268A, § 3, or the Massachusetts gift statute, Mass. Gen. Laws ch. 268B, § 6. See Sawyer, 85 F.3d at 726. The gift statute, not at issue here, prohibits lobbyists from giving public officials gifts with an aggregate value of more than $100 in a calendar year. See Mass. Gen. Laws ch. 268B, § 6. Significantly, § 6 does not require the government to prove "any improper motive to influence, or otherwise affect, the official duties of the recipient." Sawyer, 85 F.3d 728. Thus, a violation of the gift statute could not in itself constitute honest services mail fraud because the required "intent to influence" prong of § 1341 cannot be established merely through proof of a violation of § 6. See id. While we concluded that the gratuity statute, § 3, was properly charged as a predicate for honest services mail fraud, it was impossible to determine which state law violation the jury relied upon in convicting Sawyer under § 1341. See id. at 730. Concluding that one of the potential bases for the jury's verdict was thus "legally erroneous," we reversed his convictions. See id. at 731.

Significantly, this framework for establishing honest services mail fraud under § 1341 does not require proof of a violation of any state law. Because the duty of honest services owed by government officials derives from fiduciary duties at common law as well as from statute, see Silvano, 812 F.2d at 759, there is no need to base a prosecution under § 1341 on allegations that the defendant also violated state law. We recognized this point when we reversed Sawyer's conviction on direct appeal. See Sawyer, 85 F.3d at 726 ("proof of a state law violation is not required for conviction of honest services fraud"); see also United States v. DeSantis, 134 F.3d 760, 769 (6th Cir. 1998) (finding defendant prosecuted under § 1341 was entitled to a jury instruction cautioning the jury that they could not convict him merely because he knowingly violated a state law); United States v. Brumley, 116 F.3d 728, 734 (5th Cir. 1997) ("the mere violation of a [state] gratuity statute . . . will not suffice") (en banc); United States v. Williams, 545 F.2d 47, 50 (8th Cir. 1976) (stating, "[a] conviction for mail fraud does not depend upon a violation of state law"); United States v. Bush, 522 F.2d 641, 646 n.6 (7th Cir. 1975) (finding that a conviction for mail fraud is not dependent upon a violation of state law.). Accordingly, the government was not required to charge that Sawyer violated section three - or any other state Massachusetts gratuity, gift, or bribery law - in

-21-

order to secure his conviction under § 1341.  Sawyer concedes
this point in his brief by acknowledging our statement to that
effect in Sawyer.

Nonetheless, as Sawyer correctly states in his brief,
"[t]o say that proof of a state law violation '<u>is not required</u>,'
however, is not the same as saying that it <u>is not permitted</u>."
(Emphasis added).  Indeed, proving violations of state law is
one way a federal prosecutor might choose to structure a
prosecution for honest services mail fraud.  In Sawyer's case,
the government adopted this strategy in the original indictment.
See Sawyer, 85 F.3d at 726 (noting, "the parties agree that the
indictment, as structured, required [the prosecution] to prove
that Sawyer violated at least one state law.").  Using the state
law violations as "the sole vehicle to prove the scheme or
artifice to defraud" allowed the government to "narrow the
issues of intent and good faith."  Id. at 727.  As explained in
his brief, the crux of Sawyer's argument for coram nobis is that
the prosecution continued to rely on violations of Massachusetts
law in the information:

> Thus, on remand after this Court's decision
> in Sawyer, the government had two basic
> options for continuing to press its "honest
> services" mail fraud claim against Sawyer
> with regard to the gratuities that he
> allegedly had made.  First, it could
> continue to assert what it had been
> asserting all along: that Sawyer had engaged
> in a "scheme or artifice to defraud" by
> violating the state gratuity law with the

-22-

> requisite, corrupt intent to deprive the public of an official's honest services. Alternatively, it could attempt to demonstrate that Sawyer's actions were intended to induce a breach of some non-statutory source of state legislators' common law fiduciary duty to the public, without regard to the application of the gratuity statute. . . . The government opted for the former.

(Footnote omitted). If a prosecution for honest services mail fraud is structured as the indictment was, using state law violations as the "sole vehicle" to prove the scheme to defraud, failing to prove that the defendant violated the state law becomes fatal to the government's case. See Sawyer, 85 F.3d at 726.

## C.        Structure of the Information

The district court concluded that the information to which Sawyer pled guilty was structured to require proof of a state law violation. See Sawyer, 74 F. Supp. 2d at 98 ("the government was required to prove that Sawyer violated at least one state law."). We review this finding of fact for clear error,[12] see Blanton, 94 F.3d at 230, and conclude that it was

---

[12] Sawyer states in his brief that this finding is reviewed for clear error. The government contends that de novo review applies because the court's determination is inconsistent with our rulings of law in Sawyer. What the government means by "inconsistent" is not clear. However, the government concedes in a footnote that the standard of clear error applies "[t]o the extent that the district court's determination that the government was required to establish a violation of the state gratuity statute could be viewed as having any factual

-23-

clearly erroneous because the information was not predicated upon Sawyer's violation of section three of the Massachusetts gratuity statute. The information itself does not refer to any state law. Rather, it charges Sawyer with "knowingly and willfully devis[ing] and execut[ing] a scheme and artifice to defraud the Commonwealth of Massachusetts and its citizens of their right to the honest services of members of the Massachusetts Legislature for the purpose of promoting Hancock's legislative interests." There is no language in the information itself indicating that Massachusetts state law was a part of the prosecution's case against Sawyer. Thus, there is no basis for concluding that Sun-Diamond undermined the criminality of a state law that was the basis for Sawyer's guilty plea.

The government's decision to eschew reliance on Massachusetts law in the information is hardly surprising. In Sawyer, we noted that "the incorporation of a state law violation in [a prosecution for mail fraud] may cause complications." Sawyer, 85 F.3d at 726. We cautioned further:

> First, concerning the theft of honest services jury instruction, an overemphasis on what state law forbids may lead the jury to believe that state rather than federal law defines the crime, or more specifically, that any violation of a state law or

component." Thus, the parties agree, and we conclude, that the court's factual determinations regarding the basis for Sawyer's plea are reviewed for clear error. See, e.g., United States v. Blanton, 94 F.3d 227, 230 (6th Cir. 1996).

-24-

> regulation concerning lobbying or related
> matters amounts to honest services fraud.
> Wire and mail fraud are federal offenses;
> and while state violations may play a role,
> the jury should not be allowed to slip into
> the misunderstanding that any violation of
> proliferating state laws and regulations
> controlling this area automatically amounts
> to a federal crime.

Id. at 731.[13] Obviously, the state violation must be correctly charged and adequately proven, or the proof on the federal charge fails as well. See id. at 725. Indeed, we reversed Sawyer's conviction on direct appeal because the jury instructions permitted the jury to convict him based solely on a violation of the Massachusetts gift statute, without a finding that he possessed the necessary intent to influence a public official. Thus, the government might well have concluded, in deciding to retry Sawyer, that an information charging honest

---

[13] Noting the interplay between state and federal law in this area, Sawyer criticizes "the government's extraordinary attempt to 'federalize' a state ethics statute." To the extent that Sawyer posits that the federalization of criminal law renders his prosecution unjust, we simply note that the "Supreme Court rejected this federalism argument long ago." Silvano, 812 F.2d at 758 ("Whatever the limits to its power, Congress may forbid putting letters into the post office when such acts are 'done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not.'") (quoting Badders v. United States, 240 U.S. 391, 393 (1916)). In a related but distinct argument, Sawyer also claims that his prosecution offended due process by not giving him sufficient notice of what conduct is proscribed under federal law. As we have already noted, Congress enacted § 1346 in 1988 to prohibit schemes to deprive the public of their public officials' honest services. Accordingly, Sawyer had sufficient notice that his conduct could be prosecuted as a federal crime.

services mail fraud without mentioning state law would avoid some of the issues that Sawyer successfully appealed following his conviction. In its brief here, the government acknowledges our ruling in <u>Sawyer</u>, noting, "this Court went on to criticize any attempt by the government to define honest services in terms of state law requirements," and offering <u>Sawyer</u> as a justification for its strategy in structuring the information.

Although we noted in <u>Sawyer</u> that "the parties agree that the indictment, as structured, required it to prove that Sawyer violated at least one state law," <u>Sawyer</u>, 85 F.3d at 726, Sawyer's plea agreement provided that his guilty plea would result in the dismissal of the indictment. Thus, when Sawyer entered his plea of guilty, the information became the controlling document for determining what the government sought to prove.

## D.       "Illegal Gratuities"

Nonetheless, Sawyer makes several arguments in support of his claim that the information required a violation of section three. For example, he attaches significance to the government's use of the phrase "illegal gratuities" at the plea hearing and to the inclusion of this language in the Prepleading Report ("PPR"), to which the government referred at that

hearing.[14]  In explaining to the court the factual basis for Sawyer's guilty plea, the prosecution stated that it was relying on "illegal gratuities" Sawyer gave to various Massachusetts legislators.  Sawyer contends that "illegal gratuities" can only be interpreted to mean gifts or gratuities given in violation of Massachusetts state law, a position accepted by the district court.  Accordingly, Sawyer concludes that the government effectively incorporated violations of section three into the proof required in the information.

We reject this argument for two reasons.  The government's reference to "illegal gratuities" does not necessarily mean that such gratuities were illegal under § 1341 only because they were illegal under state law.  We had already made clear in Sawyer that proof of federal honest services fraud does not require proof of a violation of state law.  As the government argues, the phrase "illegal gratuities" also describes conduct that is "illegal" because, without reference

---

[14] Sawyer argues that the government has waived reliance on the PPR because the government did not refer to that document by name in its opposition to Sawyer's petition for coram nobis before the district court.  A review of those opposition papers indicates that the government did not expressly identify its reliance on the PPR.  However, the government argued in the district court that Sawyer's conviction was based on his corrupt intent and his conduct, and not on any violation of state law. Thus, because the government's references to the PPR on appeal merely identify the underlying conduct it has relied on to establish Sawyer's conviction throughout these proceedings, we find that the prosecution has not waived this argument.

to state law, it constitutes the federal crime of honest services mail fraud. Sawyer does not contend that the government ever specifically referenced the Massachusetts gratuity statute at the plea hearing. In the absence of contextual evidence giving additional meaning to the words "illegal gratuities," it was an error for the district court to read the state law predicate into the phrase.

Sawyer posits further that we should interpret "illegal gratuities" to mean "in violation of chapter 268A, section three" because the government referred to the Prepleading Report at the plea hearing. When the district court asked the government to identify the factual basis for Sawyer's guilty plea, the assistant United States attorney referenced paragraphs 10 through 30 of the "Presentence Report",[15] indicating that the conduct described therein constituted the basis for the plea. Because the PPR referred to Sawyer's alleged violations of the Massachusetts gift and gratuity statutes, Sawyer claims that

---

[15] Although the government stated, at the plea hearing, that it was relying on "the evidence as outlined in Paragraphs 10 through 30 of the Presentence Report," (emphasis added), we assume, as the government points out in its brief, that the prosecutor misspoke in referring to the "Presentence Report," ("PSR") and, in fact, meant to refer to the Prepleading Report ("PPR") that had been prepared in advance of Sawyer's plea hearing. The PSR, prepared for Sawyer's sentencing hearing following his conviction in 1995, and the PPR, prepared in anticipation of his guilty plea in 1996, are alike in all significant respects, except that the PPR details the history of Sawyer's first trial, conviction, and appeal to this Court.

such violations became a part of the proof necessary for the government's prosecution of Sawyer under the information. However, the PPR explicitly disavows any notion that violations of the state laws were necessary to find Sawyer guilty under the one count of mail fraud contained in the information. In introducing the discussion of the Massachusetts gift and gratuity statues, the PPR states, "[d]espite his detailed knowledge of both laws, Sawyer repeatedly violated the laws throughout the time period of the scheme and conspiracy, which is evidence (<u>although not exclusive evidence</u>) of his intent to violate the federal statutes." (Emphasis added). Therefore, the PPR treats the alleged violations of state law not as conclusive proof that Sawyer violated § 1341, but rather as part of a body of evidence demonstrating his intent to deprive the public of the honest services of certain Massachusetts legislators. This characterization of the evidence is consistent with the structure of the information and the government's theory of its prosecution asserted both in the district court and on appeal.

Sawyer also claims that the government was required to prove his violation of the Massachusetts gratuity law because Judge Harrington accepted his guilty plea on that theory of the prosecution. Accordingly, Sawyer argues, Judge Harrington properly granted the writ of coram nobis because he, as the

district court judge who took Sawyer's plea, understood that the factual basis of that plea involved a theory of the prosecution invalidated by Sun-Diamond.  We reject this argument.

In the opinion granting Sawyer the writ of coram nobis, Judge Harrington stated: "[t]hat the conviction would stand or fall on the basis of proof of the state statute violation was a fact understood by the parties, the original District Court Judge [a reference to the judge who presided at Sawyer's trial], the Circuit Court of Appeals, and this Court at the time of the Plea Hearing."  Sawyer, 74 F. Supp. 2d at 98 (emphasis added).  For reasons we have already explained, the understandings of the original district court judge and this Court on Sawyer's first appeal are irrelevant to the instant inquiry because the charging document at that time was the indictment, not the information.  Because the indictment is so clearly premised on a violation of state law and the information is not, the court's reliance on interpretations of the indictment is misplaced.

We also find Judge Harrington's reliance on his own understanding of the factual basis for the government's prosecution of Sawyer to be similarly misplaced.  We do not question the reality of that understanding.  However, to the extent Judge Harrington concluded that the government could prove its case against Sawyer only by proving a violation of state law, his conclusion was incorrect legally and was at odds

with the unmistakable basis of the government's prosecution at the time of the plea to the information. In short, even if Judge Harrington relied on his understanding that the government had undertaken to prove a violation of state law when he issued the writ of coram nobis, that reliance could not change the reality of the basis for the government's prosecution.

**IV.**

Because a writ of error coram nobis is an "extraordinary remedy," appropriately issued "only under circumstances compelling such action to achieve justice," see Morgan, 34 U.S. at 511, we address again an issue addressed in Sawyer - whether sufficient evidence existed to support Sawyer's conviction for honest services mail fraud apart from a conclusion that he violated the state gratuities law. If the evidence would have been otherwise sufficient to convict him, Sun-Diamond's effect on the interpretation of Massachusetts state law does not render his conviction a miscarriage of justice even if the government had assumed the burden of proving a violation of state law. In issuing the writ, the district court found that Sawyer's prosecution was "for an act that the law does not make criminal" in light of Sun-Diamond. See Sawyer, 74 F. Supp. 2d 88, 106 (D. Mass. 1999). Because we find that sufficient evidence existed to convict Sawyer absent a showing that he violated state law, this characterization by the

-31-

district court was in error.  Accordingly, we again conclude that his conviction was not based on a fundamental error of law.

**A.        Sawyer's Objections to the Prepleading Report**

We must first address Sawyer's argument that his objections to the PPR prior to the plea hearing prevented the government from relying on that document to establish the requisite factual basis for the plea.  In the addendum to the PPR, Sawyer stated the following objection:

> Defendant contends that the one count information, and any other conduct specifically related to the underlying offense, provides all of the necessary and appropriate information for determining the "relevant conduct" and requisite base offense level under § 2F1.1.  Specifically, defendant contends that the only "relevant conduct" for purposes of the Pre-sentence Report and the court's sentencing is an expenditure he made over the 1990, Fourth of July weekend.

Sawyer cites Federal Rule of Criminal Procedure 32(c)(1), and our decision in United States v. Van, 87 F.3d 1, 3 (1st Cir. 1996), for the proposition that the district court should have ruled on his objection to the PPR as an outstanding or disputed material fact prior to sentencing.  Because the district court made no such ruling to resolve his objection, he argues, the conduct described in the PPR could not have been considered part of the factual basis of his guilty plea.  However, as the plain meaning of his objection, quoted above, indicates, Sawyer was

-32-

merely objecting to the conduct to be considered by the court in sentencing, and not to the conduct the court might consider in finding a sufficient factual basis for Sawyer's guilty plea. Significantly, Sawyer did not object to the government's reliance on the conduct described in paragraphs ten through 30 of the PPR to establish the requisite factual predicate for his plea.[16]

**B.        Sufficiency of the Evidence**

Proof of honest services mail fraud requires that the defendant participated in a scheme or artifice to defraud with the specific intent to defraud.[17]  See Woodward, 149 F.3d at 54; Sawyer, 85 F.3d at 723.  In the prosecution of a non-public

---

[16] Even if Sawyer could persuade us that the sentencing procedures established in Rule 32, and discussed in Van, applied to finding a factual basis for a guilty plea, our holding in Van does not necessarily entitle him to relief.  While we ruled in that opinion that a sentencing court "must resolve any outstanding disputed facts or determine that they will not be taken into account," we also stated that while "explicit resolution of disputed material facts is preferable, we have found that the court implicitly resolved the facts when the court's statements and the sentence imposed showed that the facts were decided in a particular way."  Van, 87 F.3d at 3. Thus, even if Van were applicable to the instant situation, the district court was not required to rule explicitly on Sawyer's objections to the PPR.  Additionally, we could easily find, on this record, that the district court implicitly resolved the alleged dispute in Sawyer's objection by finding the requisite factual basis for his plea.

[17] We do not discuss the second element of honest services fraud, which requires that the accused have used the mails in furtherance of the scheme or artifice to defraud, see Woodward, 149 F.3d at 54, because Sawyer did not appeal that issue.

official such as Sawyer, "the government must prove that the target of the scheme is the deprivation of the official's honest services." Sawyer, 85 F.3d at 725. The government may prove this element by demonstrating either that Sawyer intended to improperly influence a public official in her duties, or that he intended for public officials to fail to disclose a conflict of interest. See Woodward, 149 F.3d at 57; Sawyer, 85 F.3d at 724. Additionally, Sawyer must have intended to deceive the public about his expenditures on behalf of the Massachusetts legislators. See Woodward, 149 F.3d at 55; Sawyer, 85 F.3d at 729. The prosecution may prove this requisite intent to defraud through circumstantial evidence. See United States v. Ervasti, 201 F.3d 1029, 1037 (8th Cir. 2000). Evidence exists in this record to support a finding that Sawyer acted with the requisite fraudulent intent. Accordingly, his conduct supports his guilty plea even absent a showing that he actually violated the Massachusetts gratuity statute.

### 1. Intent to Influence Official Action

The conduct described in the PPR evinces Sawyer's intent to enter a scheme to deprive the public of the honest services of various Massachusetts legislators by influencing those legislators in their official actions. Over the course of more than nine years, Sawyer intentionally provided over 25 Massachusetts legislators with gifts totaling approximately

$35,000. According to the PPR, these gifts included "hotel rooms, expensive dinners for legislators and their spouses, rounds of golf at luxury resorts and at Sawyer's private country club, and tickets to theater and sporting events." Almost one-quarter of these expenditures, about $8,500, were used to entertain Representative Francis Woodward during the five years he served as House Chair for the Insurance Committee. Woodward's position on that committee gave him the opportunity to affect Hancock's interests in pending legislation. More significantly, paragraph 25 of the PPR states, "[Woodward] 'carried' most of the legislation sought by Hancock and other life insurance companies during his tenure as House Chair, shepherding the bills through the Insurance Committee and the full House of Representatives." The evidence further indicated that Sawyer's gratuities to Woodward and other legislators "virtually ceased" after those representatives left office. Finally, Sawyer took credit, in memoranda he wrote to his supervisors at Hancock, for the passage or defeat of legislation affecting Hancock's interests in the insurance industry. Therefore, Sawyer understood that his conduct affected, at least in part, the actions taken by the legislators he entertained. These facts point to a conclusion that Sawyer intended for the legislators to be influenced by his expenditures.

As part of his defense at his trial, Sawyer contended that he thought these expenditures were lawful and merely a part of "goodwill entertaining." See Sawyer, 85 F.3d at 731. However, evidence described in the PPR reveals his awareness of the gift and gratuity laws and his understanding that he might be violating those statutes. In his office, Sawyer kept binder notebooks with information about the Massachusetts laws proscribing gifts to public officials under certain circumstances. While violations of those laws need not be proven for there to be a sufficient factual basis for his guilty plea, they provide evidence of his intent with respect to the expenditures and cast doubt on his claim that he believed the expenses were lawful.

Moreover, aside from any obligations Sawyer and Massachusetts legislators may have had under state law, public officials also have fiduciary duties under common law to ensure that the public receives their honest service free of improper influence of corruption. We have described § 1341 in this manner, without reference to any ethical obligations arising under state law, in other rulings. See, e.g., Woodward, 149 F.3d at 58 (noting that Woodward's acceptance of expenditures from Sawyer "constituted theft of the honest services that Woodward owed to his constituents"); Sawyer, 85 F.3d at 730 (stating that § 1341 requires, "in connection with the gratuity,

the intent to cause an official to deviate from the honest performance of services.").

## 2.	Intent to Deceive the Public

To establish an adequate factual basis for Sawyer's plea of guilty, we must also find that he demonstrated an intent to deceive the public with respect to his conduct.  See Sawyer, 85 F.3d at 732; see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990).  We carefully analyzed this requirement in Sawyer:

> [I]t appears that the requisite intent to deceive could have been shown either through Sawyer's own acts of deception toward the public with respect to the gift/gratuity statute violations, or through his efforts to ensure that the legislators deceived the public with respect to the violations.  The latter requires evidence only that Sawyer intended to cause the legislators intentionally to fail to disclose material information about the violations, although evidence that he intended the legislators to affirmatively misrepresent themselves in this regard would also suffice.  At bottom, the evidence must be sufficient to establish Sawyer's intent that, in the end, the public be deceived with respect to his unlawful gifts and gratuities.

Sawyer, 85 F.3d 732-33 (footnote omitted).  Considering the evidence against this standard, we find that facts described in the PPR indicate that Sawyer acted to deceive the public, or to induce legislators to deceive the public, with respect to his expenditures on their entertainment.  For example, when Sawyer

organized a high-profile event to celebrate the Boston Marathon, he took steps to ensure that the spending would not exceed limits proscribed by Massachusetts law.  However, he made no such efforts to comply with the law when entertainment expenditures would not be so visible to the public, a fact which is probative of his intent to deceive the citizens of Massachusetts.  Again, whether Sawyer actually violated state laws in these instances is irrelevant to our inquiry because honest services mail fraud does not depend on a violation of state law.  Indeed, the duty to disclose a conflict of interest, the violation of which indicates an intent to deceive in these circumstances, arises from common law as well as from Massachusetts statute.  "[S]eparate and apart from the state statute, '[t]he obligation to disclose material information inheres in the legislator's general fiduciary duty to the public.'"  Woodward, 149 F.3d at 62 (quoting Sawyer, 85 F.3d at 733 n.17).  See also Silvano, 812 F.2d at 759 ("[T]he affirmative duty to disclose material information arises out of a government official's fiduciary relationship to his or her employer.").  Therefore, a jury would not have to find that Sawyer violated the Massachusetts statute to convict him of the crime to which he pled guilty; the jury would have to find only that Sawyer intended for state officials to deceive the public

by breaching their common law duty to disclose a conflict of interest.

Our conclusion that the evidence adequately supported Sawyer's guilty plea is strengthened by our previous ruling in Sawyer, where we rejected his challenge to the sufficiency of the evidence both with respect to his intent to influence and his intent to deceive. In addressing his challenge regarding the intent to influence legislators' official acts, we stated:

> At trial, there was evidence that Sawyer intentionally and repeatedly provided legislators with valuable gifts of entertainment for the purpose of obtaining "greater access" to, and of developing a "certain relationship with," legislators. A jury could credit Sawyer's defense that he thought his expenditures were lawful and that they were meant only for goodwill entertaining. Taking the evidence in the light most favorable to the prosecution, however . . . a jury could also rationally infer, beyond a reasonable doubt that Sawyer intended that his repeated gifts and gratuities would induce legislators to perform official acts to benefit Hancock's interests regardless of, or at the expense of, the public interest.

Sawyer, 85 F.3d at 731 (footnote and citations omitted). See also Woodward, 149 F.3d at 57 (noting, after summarizing the discussion of Sawyer's intent in Sawyer, "The same inferences regarding Woodward's intent can be drawn from the evidence here, based upon the nature and sequences of events, certain explicit statements, and the suggestions of a cover-up.").

-39-

Similarly, we concluded in <u>Sawyer</u> that the evidence was sufficient for a rational jury to agree that Sawyer intended to deceive citizens of Massachusetts. Having described Sawyer's awareness of the Massachusetts lobbying laws, by pointing to evidence of newspaper articles and binder notebooks he maintained on such legal obligations, we held, "A jury rationally could infer that Sawyer was cognizant of his ethical obligations in lobbying, knew of the public awareness of lobbying activity, and repeatedly gave hidden unlawful gifts and gratuities until he was publicly exposed." <u>Sawyer</u>, 85 F.3d at 733. Noting that this evidence is "not overwhelming," we nonetheless concluded that "the combined evidence is sufficient to permit a reasonable jury to find, beyond a reasonable doubt, that Sawyer intended to deceive the public about his unlawful expenditures on legislators." <u>Id.</u> at 734. <u>See</u> <u>also</u> <u>Woodward</u>, 149 F.3d at 57 (describing, on similar facts, "the suggestions of a cover-up" regarding Sawyer's expenditures on Woodward and other legislators).

## V.

Because the information to which Sawyer pled guilty did not require proof of a violation of the Massachusetts gratuity statute, <u>Sun-Diamond</u>'s interpretation of the analogous federal gratuity statute did not undermine the legality of Sawyer's conviction for honest services mail fraud. Moreover,

independently of proof of a violation of state law, there was sufficient evidence to support Sawyer's conviction for honest services mail fraud. However, in <u>Sawyer</u>, recognizing that "prosecutions on facts like these have not generally been brought," we expressed our concern about "the close relationship between lobbying activities that are lawful" under federal law, and "slightly more extreme versions of such conduct that can constitute federal violations." <u>Sawyer</u>, 85 F.3d at 741. We cautioned further that "every transgression of governmental obligations" should not be turned into a federal felony. <u>Id.</u> at 728. Judge Harrington has spoken forcefully to this point. Therefore, we wish to be clear in this case that we hold only, for the purpose of determining whether there was a fundamental legal error in his conviction, that there was an adequate factual basis for Sawyer's plea. Accordingly, Sawyer was not entitled to a writ of error coram nobis, assuming its availability for relief from such errors.

**<u>Judgment vacated.</u>**

**<u>Concurring Opinion Follows</u>**

**BOUDIN, Circuit Judge, concurring.** At Sawyer's original trial, the government urged a view of honest services mail fraud that allowed the jury to convict by finding a violation of either the gift or the gratuity ban under Massachusetts state law. We reversed his conviction on this charge because the instructions allowed the jury to convict without finding that Sawyer had the intent to affect any official act of any legislator who received the benefits that Sawyer was conferring. United States v. Sawyer, 85 F.3d 713, 729 (1st Cir. 1996). However, the decision also rejected Sawyer's claim to a directed acquittal; we found that the evidence was sufficient to convict him under the mail fraud statute. Id. at 731, 733-34.

On remand, Sawyer chose to plead to a single count of mail fraud set forth in an information which did not refer to state law, and he received a sentence that included no time in jail. Thereafter, the Massachusetts Supreme Judicial Court--following the Supreme Court's construction of the federal gratuity state in United States v. Sun-Diamond Growers of California, 526 U.S. 398 (1999)--construed the state gratuity statute in a way that would have made it harder for the government to prove that the benefits conferred by Sawyer violated the state statute. Scaccia v. State Ethics Comm'n, 727 N.E.2d 824, 827-28 (Mass. 2000).

-42-

In the coram nobis proceeding below, the district court ruled, and Sawyer now argues on appeal, that Sawyer's extant conviction for mail fraud (based on his guilty plea) rests on a legal error, namely, the premise that his favors to state legislators violated the state gratuity statute as narrowed by Sun-Diamond and Scaccia. But Sawyer's conviction does not rest on this premise in any meaningful way. Sawyer was convicted on his own plea of guilty to the federal mail fraud statute; there was an adequate basis for the plea without regard to whether he violated the state gratuity statute; and nothing in Sun-Diamond has been shown to undermine a plea of guilty to a statute not even addressed in Sun-Diamond.

To justify Sawyer's guilty plea, it was enough that the government pointed to evidence, or proffered facts, that would furnish a rational basis for the plea. Fed. R. Crim. P. 11; United States v. Gandia-Maysonet, 227 F.3d 1, 6 (1st Cir. 2000). The government did so by pointing to the favors Sawyer conferred on state legislators and to their context. This was the same evidence that our earlier decision in Sawyer had already said not only colorably might, but actually would, permit a jury to convict Sawyer of mail fraud. It is hard to imagine a more secure basis for accepting a plea.

The district court's coram nobis decision treats the guilty plea as if it somehow rested on the same legal theory

that the government had pressed at the first trial, equating a violation of the state statutes with a violation of the federal mail fraud statute.  <u>United States</u> v. <u>Sawyer</u>, 74 Supp. 2d 88, 98-99 (D. Mass. 1999).  But that was the very theory that had been rejected by this court before the plea.  No one--district court, government, or Sawyer--would have thought that this equation could have been pressed at a second trial or comprised the basis for the new plea.  The constant element was not the theory earlier advanced; it was the benefits Sawyer conferred.

It is possible, perhaps even likely, that the evidence submitted at the first trial would not, under <u>Sun-Diamond</u> and <u>Scaccia</u>, permit a federal or state jury to convict Sawyer of a gratuity statute violation.  On this assumption, Sawyer might have argued in the <u>coram nobis</u> proceeding that the mail fraud statute should not be read more broadly than the gratuity statute and that, therefore, the same evidence could not justify his conviction under the mail fraud statute.  But, of course, the mail fraud statute is quite differently worded, and Sawyer has not made any such argument.  In sum, the guilty plea does not rest on a legal error.

Nothing in the panel opinion in the present case should be taken as endorsing a broad construction of the mail fraud statute as applied to lobbyists' favors.  Our original <u>Sawyer</u> decision reflects this court's abiding concern about a too

-44-

generous reading of the mail fraud statute as applied to hitherto routine, if highly unattractive, lobbying activities. Sun-Diamond, although it does not invalidate Sawyer's conviction under a different statute, suggests that the Supreme Court shares some of the concerns that animated the original Sawyer decision.  See Sun-Diamond, 526 U.S. at 406-07.

As for the evidence against Sawyer, its strength should not be overstated; the original Sawyer decision said only that conviction of Sawyer under the mail fraud statute was not impossible, 85 F.3d at 731, 733-34.  Sawyer himself, not here as a candidate for an award for civics, is entitled at least to this acknowledgment: that no one knows just what a properly instructed jury would have done if the government had chosen to retry him for mail fraud after our earlier decision in Sawyer-- which is presumably why he and the government entered into the one-count plea agreement that avoided jail for Sawyer.