**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Marshall DeWayne WILLIAMS, Defendant-Appellant.**

**No. 84–1928**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Nov. 5, 1985.

James C. Tubb, (court appointed), Dallas, Tex., for defendant-appellant.

Marvin Collins, U.S. Atty., Shirley Baccus-Lobel, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before REAVLEY, HIGGINBOTHAM and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Marshall DeWayne Williams was convicted on three counts related to the planting of a pipe bomb which killed Williams' stepfather, Ward S. Keeton, Sr. We vacate the life sentence given Williams on count one and remand for resentencing, and we affirm in all other respects.

## I. Facts

A jury found Williams guilty on each of the three counts on which he was tried. Count one charged that he maliciously destroyed a coin-operated newspaper dispenser by means of an explosion which resulted

in the death of Keeton.[1] Count two charged Williams with possession of an unregistered "firearm," the pipe bomb.[2] Count three charged that Williams made this firearm without the required regulatory approval.[3] The district court sentenced Williams to life imprisonment on count one and to two terms of ten years imprisonment on each of counts two and three, with these two terms to run concurrently with one another and consecutively to count one.

Evidence adduced at trial showed that Keeton was killed on January 27, 1984, when he opened a newspaper dispenser located adjacent to the apartment complex where he lived. The dispenser was rigged with a mechanism which activated a pipe bomb inside the dispenser. The resulting explosion of the pipe bomb killed Keeton and destroyed the machine.

Keeton had married Williams' mother, Clara, in September 1983, and they lived together with Williams, Williams' wife and child, Williams' younger brother, and Mike Cornett, Williams' younger cousin, in a rented house in Mesquite, a suburb of Dallas. In early November, Keeton moved out and contacted his attorney. Keeton told the attorney that he wanted a divorce because he had made a "terrible mistake" in marrying Clara and was fearful of his wife's family. On the date Keeton filed for divorce, he told Williams' aunt that he had tapes to show that Clara, Williams, and Williams' sister were plotting to kill him for his money. Keeton moved into the apartment complex where he was later

---

1. Count one charged a violation of the following statute:

> (i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results ... shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results ... shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

18 U.S.C. § 844(i).

The referenced punishment section provided the following:

> Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion shall so order.

18 U.S.C. § 34.

2. "It shall be unlawful for any person ...

> (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."

26 U.S.C. § 5861(d).

The term "firearm" is defined as including "a destructive device," 26 U.S.C. § 5845(a)(8), which in turn is defined as "any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge at more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine or (F) similar device...." 26 U.S.C. 5845(f)(1).

3. "It shall be unlawful for any person ...

> (f) to make a firearm in violation of the provisions of this chapter."

26 U.S.C. § 5861(f). A person must meet several requirements before he may lawfully make a firearm:

> No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

26 U.S.C. § 5822. The definition of "firearm" is the same for count three as for count two. The punishment provision relevant to counts two and three allows maximum sentences of ten years imprisonment and maximum fines of $10,000. 26 U.S.C. § 5871.

killed, and Clara joined him shortly thereafter.

In January 1984 Clara called Keeton's attorney to tell him to drop the divorce action because she and Keeton were reunited. On January 18 Keeton executed a designation of beneficiary form for a company life insurance policy, naming Clara as beneficiary. Clara evidently knew about the policy and a few days after Keeton's death talked to a company official about how to file claims for insurance benefits.

During the same month, Williams persuaded a friend to give him a ride to a plumbing shop to buy some steel pipe. Williams bought a length of two-inch steel pipe with threaded ends and two end caps. His cousin Cornett later saw the pipe and end caps in a dresser drawer at the house in Mesquite, together with a shoe box, a rat trap, and a small cannister. When Cornett inquired about it, Williams said it was an "experiment," and later told Cornett the same thing when he saw the same items lying on the kitchen table, together with a piece of wood, shotgun primers, string or wire, a hammer, and nails. Williams, a former member of the Marine Corps, had completed all the lessons (but not the final exam) in a Marine correspondence course on land mine warfare and demolition; the course book had instructions on the design of a pressure-release firing device known as a "mouse trap" bomb.

On the morning of Keeton's death, January 27, 1984, Williams' brother and Cornett arose about 10:30 a.m. and found Williams watching television. Cornett testified Williams told him that Keeton had been killed and that it would be on the news at noon, which it was. According to Cornett's account, Williams then informed them that he had put a bomb in the newspaper stand, having watched Keeton go the dispenser at the same time on previous mornings. Williams allegedly said that he had sat across the street and watched the explosion.

Cornett testified that Clara then asked them to rent a truck to remove items from Keeton's apartment, and that she told them they were moving to Houston. On the next day, January 28, Williams went to a truck rental agency and mentioned to the salesman that it was his "father" who had been killed in the newsstand bombing. According to the salesman, Williams told him Keeton went to the newspaper dispenser every morning, and Williams laughed and said "that would teach him to get habits, won't it." Williams then rented a truck for a one-way trip to Houston.

After renting the truck, Williams went with his younger brother and Cornett to Keeton's apartment, and they loaded the contents of the apartment into the truck. During the loading of the truck, Williams spoke to neighbors at the complex and discussed among other things the possible responsibility of the Ku Klux Klan for the bombing. Williams mentioned to one of the neighbors that he had entered Keeton's apartment before the police did and had removed a Ku Klux Klan membership plaque belonging to Keeton. When the police entered the apartment shortly after the bombing, they found three prominently placed "love notes" from Clara to Keeton asking Keeton to call her on Friday, January 27, the day of his death.

After loading additional items in the rented truck from the Mesquite residence, Williams, his brother, Cornett, and a friend drove to Houston. On the following Monday, Williams rented a house in Crosby, Texas, near Houston, for an amount roughly twice the rental on the Mesquite house. Williams gave a cash deposit, and his father (Clara's first husband) guaranteed the rent. Williams told the realtor that he was moving because his employer had granted his request for a transfer by offering to transfer him to the Houston area. However, Williams called his supervisor in Dallas to tell him that he had to miss a day of work in order to help his parents move some items in Houston, but that he would be back into work the next day. In fact, Williams had not requested a transfer, been transferred, or otherwise sought employment in the Houston area.

After returning to Mesquite for another load, Williams and Clara cooperated with

the ongoing homicide investigation, consenting to a search where boards, nails, paint, and tools were recovered from the Mesquite house. Wood and nails recovered from the bomb scene matched these samples taken in the search. Williams, during an interview with a Dallas police officer, stated that his uncle, Billy Jeff Cornett, had made the bomb that killed Keeton. However, Billy Jeff proved to have a well corroborated alibi and was not prosecuted.

## II. Life Sentence

Williams first contends that the district court exceeded statutory limits by sentencing him to life imprisonment on count one. The statute prohibiting the malicious destruction of property used in interstate commerce provides that if death results, a violator "shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title." 18 U.S.C. § 844(i). The referenced section provides that a convicted defendant "shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct...." 18 U.S.C. § 34. Williams argues that since the issue of punishment was never submitted to the jury, the district court was not authorized to impose a life sentence. The parties agree that the death penalty portions of the statutes were invalidated as a result of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and subsequent cases.

The government concedes that section 34 does not authorize the district court to sentence Williams to life imprisonment, but argues instead that the court was so empowered by section 844(i). In the government's view, the phrase "any term of years" in section 844(i) includes life imprisonment. The government contends that life imprisonment constitutes a term of years, conceptually definite though un-

known as to the precise number. We reject such a construction of section 844(i).

 The district court was without power to impose a life sentence. Generally, this court will not review the severity of a sentence imposed within statutory limits absent a gross abuse of discretion. *United States v. Adi,* 759 F.2d 404, 411 (5th Cir. 1985). Here, however, under the clear meaning of the combination of sections 844(i) and 34, Williams may be sentenced by the district court only to "any term of years" and not to life imprisonment in the absence of a jury recommendation or jury waiver. *See United States v. McFillin,* 487 F.Supp. 1130, 1133 (D.Md.1980). The elimination of the death penalty provision does not mean that the power to sentence a defendant has passed to the court and has been taken away from the jury. *Id.* at 1132–33. To include life imprisonment within the phrase "any term of years" is contrary to the unambiguous statutory language. Absent the recommendation of the jury, this sentence was improper and must be vacated and the cause remanded to the district court for resentencing.[4] *See United States v. Hansen,* 755 F.2d 629, 631 (8th Cir.1985).

## III. Instructions on Flight

Williams next contends that the district court erred in instructing the jury as follows:

Intentional flight of a person immediately after a crime has been committed is not, of course, sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you, in the light of all the other evidence in the case, in determining [guilt] or innocence. Whether the defendant's conduct in this case constituted flight is exclusively for you to determine. And if you do so determine, whether or not that flight showed a consciousness of guilt on his

---

**4.** The government points out that for any term of imprisonment in excess of thirty years, or for life imprisonment, a prisoner is eligible for parole after serving ten years; thus, a definite term over thirty years and an indefinite term of life are treated the same. *See* 18 U.S.C. § 4205(a). However, this fact does not alone persuade us that Congress intended the two to be interchangeable for all purposes.

part, and the significance to be attached to that evidence, are also matters exclusively [within] your province.

In your consideration of any evidence of flight, if you should find that there was any flight, you should also consider that there [may] be reasons for this which are fully consistent with innocence. There may be many reasons for a person to be reluctant to be interviewed by law enforcement agents, which are perfectly innocent reasons, and which in no way show any consciousness of guilt on the part of that person. Also, a feeling of guilt does not necessarily reflect actual guilt of a crime you may be considering. You should always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Williams objected to this instruction at trial, and argues that it was improper because the evidence did not show that his move to the Houston area was prompted by any consciousness of guilt on his part. Williams contends that he was merely following his mother Clara's directions. Williams submits that his return to Keeton's apartment the day after the bombing, coupled with his later cooperation with Dallas police, indicates a lack of consciousness of guilt.

■ The government correctly points out that evidence of an accused's flight is generally admissible as tending to establish his guilt. *United States v. Borders*, 693 F.2d 1318, 1324 (11th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983); *United States v. Ballard*, 423 F.2d 127, 133 (5th Cir.1970). Williams did not object at trial to the admission of evidence concerning his move to the Houston area, nor does he now challenge that evidence as inadmissible. Williams does not contend that he was unaware at the time of the move that he was or could be the subject of a criminal investigation, nor does he claim

that there was a significant delay from the commission of the crime to the time of the move—two factors recognized as weakening the probative value of flight evidence. *See Borders*, 693 F.2d at 1325–26.

■ Moreover, the circumstances of Williams' move indicated a consciousness of guilt. Clara testified that it was not her idea to move, stating that "the kids"—Williams, Williams' brother, and Cornett— were instead responsible. Williams rented the truck on the morning after Keeton's death, and drove to the Houston area that night after loading large amounts of furniture from Keeton's apartment and the Mesquite house. The house Williams rented in Crosby was roughly twice as expensive as the house in Mesquite, even though being in arrears for the rent was one of the ostensible reasons for the move. Williams apparently lied to the realtor and to Williams' supervisor about the circumstances of his presence in the Houston area. Williams' return to the scene of the crime, as well as his later cooperation with police, may indicate either a lack of consciousness of guilt or an attempt to avert suspicion.

■ Once the evidence of flight was properly admitted, the district court did not err in giving the limiting instructions to the jury. Instructions substantially similar to the ones given here have been upheld. *United States v. Stewart*, 579 F.2d 356, 359 & n. 3 (5th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1978). These instructions cautioned the jury not to place exclusive reliance on the evidence of flight but to consider possible innocent reasons for Williams' actions, and they made the jury aware that it was for them to determine whether the evidence proved flight. Under these circumstances, it was not reversible error for the court to give limiting instructions on flight rather than to refrain from any comment. *Borders*, 693 F.2d at 1327.[5]

5. Williams suggests that it was reversible error not to include reference to the four inferences required for flight to have significant probative value:

Analytically, flight is an admission by conduct. Its probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be

## IV. Lesser Included Offenses

Williams finally contends that the district court erred in failing to instruct the jury that he could be convicted of a lesser included offense.[6] Williams argues that count one necessarily includes the elements of count three, and that count three necessarily includes the elements of count two. Williams cites *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844, 847 (1973), which held that a federal defendant "is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Williams concedes that the instructions correctly set out the elements of each offense charged in the three counts.[7]

drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.
*United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). However, the *Myers* court held flight instructions improper not because of their wording but because the instructions lacked an evidentiary basis in the record: the physical acts allegedly constituting flight were not established, the accused may have fled only because he felt guilty about a prior crime, and there was a delay of three to six weeks between the date of the crime charged and the later alleged flight. *Id.* at 1049–51. None of these evidentiary infirmities are present in the government's case against Williams. The instructions given here properly explained the potential weaknesses in the *Myers* chain of inferences without using the exact language of *Myers*. *See Borders*, 693 F.2d at 1328.

6. The court's charge did not include the following instruction proposed by Williams:
The law permits the jury to find the accused guilty of any lesser offense which is necessarily included in the crime charged in the indictment-information, whenever such a course is consistent with the facts found by the jury from the evidence in the case, and with the law as given in the instructions of the Court.
So, if the jury should unanimously find the accused "Not Guilty" of the crime charged in the indictment then the jury must proceed to determine the guilt or innocence of the accused as to any lesser offense which is necessarily included in the crime charged.
The crime enumerated in Count 1 of the indictment in this case necessarily includes the lesser offense enumerated in Count 3 of the indictment. The crime enumerated in Count 3 of the indictment necessarily includes the lesser offense enumerated in Count 2 of the indictment.
The jury will bear in mind that the burden is always upon the prosecution to prove beyond a reasonable doubt every essential element of any lesser offense which is necessarily included in any crime charged in the indictment; the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

7. The district court gave the following instructions on the elements of each offense:
Count 1: It is charged in Count 1 of the indictment that: on or about January 27, 1984, in the Dallas Division in the Northern District of Texas the defendant, [Marshall] DeWayne Williams, did maliciously damage and destroy by means of an explosive bomb, a coin-operated newspaper dispenser owned and operated by the Dallas Morning News, and located at the Valley View Trails Apartments, 5616 Spring Valley Road, Dallas, Texas, such property then being used in an activity affecting interstate commerce, and resulting in death to the person of Ward S. Keeton, Sr.
A violation of Title 18, United States Code, Section 844(i)....
In order to establish that a defendant is guilty of this offense, the government must prove the following four elements beyond a reasonable doubt:
First, that the defendant maliciously damaged or destroyed property;
Second, that in damaging or destroying the property, the defendant did so by means of an explosive;
Third, that the property was being used in an activity affecting interstate commerce; and
Fourth, that the use of the explosive resulted in the death of a person....
It is charged in Count 2 of the indictment that: on or about January 27, 1984, in the Dallas Division of the Northern District of Texas, the defendant, [Marshall] DeWayne Williams, did knowingly and unlawfully possess a firearm, as defined by Section 5845(a), Title 26, United States Code, that is a destructive device, and more particularly described as an explosive bomb consisting of one piece of galvanized pipe containing smokeless gunpowder and fitted with two end caps, which firearm was not registered to him in the National Firearms Registration and Transfer Record.
A violation of Title 26, United States Code, Sections 5861(a) and 5871.

█ The lesser included offense doctrine is well established in federal law. *See Keeble*, 412 U.S. at 208, 93 S.Ct. at 1995, 36 L.Ed.2d at 847; *Sansone v. United States*, 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882, 887 (1965). Federal Rule of Criminal Procedure 31(c) codified the preexisting law: "The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." While the doctrine developed at common law to assist the prosecution in cases where the evidence failed to establish some element of the offense charged, a defendant is also entitled to a lesser included offense instruction where warranted by the evidence. *Keeble*, 412 U.S. at 208, 93 S.Ct. at 1995, 36 L.Ed.2d at 847.

█ The district court did not err in omitting the proposed lesser included offense instruction. The court made it clear to the jury that it had the option of convicting Williams on any, all, or none of the three counts charged:

The indictment in this case contains three counts. A separate crime or offense is [charged] in each of the three counts of the indictment. Each charge, and the evidence pertaining to it, should be considered separately. The fact that you may find the defendant guilty or not guilty of any of the offenses charged should not affect your verdict as to any other offense charged.

Williams has not claimed that the jury might have rationally found him guilty of some lesser *uncharged* offense while acquitting him of a greater *charged* offense.

█ Moreover, neither of the elements of count three are included in count one; one need not have manufactured a bomb or failed to receive regulatory permission to do so in order to destroy property by means of an explosive under count one. The offenses of unlawful possession (count two) and unlawful manufacture (count three) of a destructive device, while containing common elements, may be tried together, although consecutive maximum sentences may not be imposed. *United States v. Kaplan*, 588 F.2d 71, 74–75 (4th Cir.1978), *modified sub nom. United States v. Seidel*, 620 F.2d 1006 (1980); *see Rollins v. United States*, 543 F.2d 574, 575 (5th Cir.1976). Williams' sentence was amended by the district court to provide concurrent ten-year terms on counts two and three to comply with this rule.

In order to establish the offense prohibited by this statute, there are two essential elements which the government must prove beyond a reasonable doubt.

First, that the defendant, on or about the time and at the place charge in the indictment knowingly possessed a destructive device, and;

Second, that the destructive device was not then registered to the defendant in the National Firearms Registration and Transfer Record....

Count 3: It is charged in Count 3 of the indictment that: on or about January of 1984, in the Dallas Division of the Northern District of Texas, the defendant, [Marshall] DeWayne Williams, did knowingly and unlawfully make a firearm, as defined by Section 5845(a), Title 26, United States Code, that is, a destructive device, and more particularly described as an explosive bomb consisting of one piece of galvanized pipe containing smokeless gunpowder and fitted with two end caps, in violation of the provisions of Title 26, United States Code, in that he did make such firearm without first obtaining an approved application form as required by Section 5822(e), Title 26, United States Code, showing approval of such making and the registration of the firearm.

A violation of Title 26, United States Code, Sections 5861(f) and 5871.

In order to establish the offense prohibited by this statute, there are two essential elements which the government must prove beyond a reasonable doubt.

First: that the defendant on or about the time and at the place charged in the indictment, knowingly made a destructive device; and

Second: that prior to the making of the destructive device, the defendant failed to obtain an approved application form from the Secretary of the Treasury or his delegate showing approval to make and register the destructive device as required by Section 5822.

### V. Conclusion

Accordingly, Williams' convictions on all three counts are affirmed, as the district court did not err in its instructions to the jury. Williams' life sentence is vacated, however, and this cause is remanded for resentencing on count one.

AFFIRMED in part; VACATED in part and REMANDED.